BAKER NATIONAL BANK, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Baker Nat'l Bank v. Commissioner
Docket Nos. 2807-69 - 2815-69; 1910-72; 6300-72 - 6306-72.
United States Tax Court
T.C. Memo 1974-104; 1974 Tax Ct. Memo LEXIS 214; 33 T.C.M. (CCH) 506; T.C.M. (RIA) 74104; April 29, 1974, Filed. Thomas E. Towe, and Neil D. Enright, for the petitioners. David R. Brennan, for the respondent. FAY
FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years in issue as follows: Petitioner
Year
Deficiency per
Statutory Notice
Increased Deficiency [1]
Baker National Bank
1965
$ 4,621.10
1966
12,066.10
1967
8,400.64
$2,065.53
Fairview Bank
1965
7,099.68
-
1965
n2 709.97
-
1966
5,251.29
-
1967
2,630.91
699.34
First National Bank of
Circle
1965
19,620.47
-
1966
18,582.99
-
1967
16,003.17
5,231.34
First Security Bank of
Red Lodge
1965
9,322.35
-
1966
8,942.65
-
1967
4,648.00
1,533.29
First National Bank of
Wibaux
1964
85.59
-
1965
10,723.70
-
1966
12,427.00
-
1967
17,975.12
2,129.90
Gallatin Trust and
Savings Bank
1965
6,274.99
-
1966
35,634.13
-
1967
11,731.57
3,810.19
Montana National Bank
of Absarokee
1964
12.74
-
1965
2,690.39
-
1966
808.05
-
1967
2,169.18
274.06
Montana National Bank
of Plentywood
1967
4,796.07
1,265.22
Edward and Florence
Towe
1965
18,371.59
-
1966
27,832.68
-
1967
30,974.26
-
First National Bank of
Ekalaka
1967
4,988.22
-
1968
8,759.92
-
1969
14,087.82
-
First Security Bank of
Red Lodge Profit
Sharing Plan & Trust
1967
634.05
-
First National Bank of
Circle Profit Sharing
Plan & Trust
1967
857.42
-
Montana National Bank
of Absarokee Profit
Sharing Plan & Trust
1967
68.12
-
First National Bank of
Reserve Profit
Sharing Plan & Trust
1967
28.85
-
Fairview Bank Profit
Sharing Plan & Trust
1967
285.94
-
Baker National Bank
Profit Sharing Plan &
Trust
1967
306.06
-
Gallatin Trust and
Savings Bank Profit
Sharing Plan & Trust
1967
178.30
-
*218 The issues remaining for disposition by this Court are as follows: (1) whether the amounts paid by the pertinent petitioner banks to petitioner Edward Towe ("Towe") as compensation for services rendered during the taxable years 1965, 1966 and 1967 constituted reasonable compensation; (2) whether the amounts paid by petitioners First National Bank of Ekalaka and First National Bank of Wibaux to Ellis Jones ("Jones") as compensation for services rendered during the pertinent years from 1965 through 1969 constituted reasonable compensation; (3) whether the amounts paid by petitioner First National Bank of Ekalaka to Roland T. Quade ("Quade") as compensation for services rendered during the taxable years 1967, 1968 and 1969 constituted reasonable compensation; (4) the proper value that petitioner Towe was entitled to use for cows contributed by him as a charitable contribution to the Friends Boarding School of Barnesville, Ohio ("the School"), in 1965, 1966 and 1967; (5) whether petitioner Montana *219 Bank of Plentywood was entitled to a net operating loss carryforward of $21,283.40 from its taxable year 1966 to its taxable year 1967 when the bank had taxable income of $23,748.70 in 1963: (6) whether the deductions taken by the pertinent petitioner banks for contributions to their respective profit-sharing plans should be disallowed partially or entirely for the pertinent years in issue; and (7) whether the involved petitioner profit-sharing trusts are subject to income taxation for the year 1967. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Edward and Florence Towe are husband and wife who resided in Circle, Montana, at the time of the filing of their petition in the instant case. Each of the petitioner banks had its primary place of business in Montana both at the time of filing their respective tax returns during the years in issue and at the time of filing their respective petitions in the instant case. Petitioners Edward and Florence Towe filed joint Federal income tax returns for each of the pertinent years in issue with the district *220 director of internal revenue, Helena, Montana. Each of the petitioner banks filed its respective Federal income tax returns for the pertinent years in issue with the district director of internal revenue, Helena, Montana. REASONABLE COMPENSATION ISSUE Towe first acquired an interest in a bank in 1950. The bank was located in Dupree, South Dakota. Prior to that time Towe's activities had varied appreciably, ranging from farming to acquisition of Ford dealerships. Towe acquired directly or indirectly management control of each of the pertinent petitioner banks on the following dates: Gallatin
May 20, 1965
Red Lodge
May or June 1961
Fairview
December 1960
Baker
June 1963
Wibaux
August 1956
Absarokee
April 1963
Plentywood
August 1966
Circle
July 20, 1954
Generally, at the time Towe acquired control of the pertinent petitioner banks, or sometime thereafter, he took into executive management respective banks. In each case the resident manager became a resident manager for each bank. Simultaneously, the resident managers acquired a significant stock interest in their indebted for the purchase price. In one form or another Towe guaranteed each *221 indebtedness and made it possible to make the purchase. The following table relates the approximate cost of Towe's bank purchases: Red Lodge
$ 250,000
Fairview
165,000
Baker
343,750
Absarokee
151,554
Circle
223,000
As of 1965 Towe personally owned the following percentages of the pertinent petitioner banks: Gallatin
49.10%
Red Lodge
48.10%
Fairview
46.20%
Baker
48.80%
Absarokee
40.66-2/3%
Wibaux
43.83-1/3%
Plentywood
0%
Circle
48.00%
Moreover, Towe and his family owned at least 50 percent of the stock of each of these banks. The resident managers in 1965 owned percentage interest of their respective banks as follows: Gallatin
James E. Updike
16.76%
Red Lodge
Harry Jones
37.25%
Fairview
Walter Shires
28.60%
Baker
Vern Bublits
32.53-1/3%
Wibaux
Ellis Jones
43.83-1/3%
Absarokee
Ambrose H. Heimer
12.55-5/9%
Circle
Vernon Harms
50.00%
Towe's total combined compensation from the pertinent petitioner banks during the years in issue was as follows: 1965
$147,615
1966
174,293
1967
180,550
Towe's aggregate compensation from the pertinent petitioner banks during the *222 years in issue was composed of the following component elements: Total
Absarokee
Baker
Circle
Fairview
1965
Bank Size
$26,030,098
$1,500,547
$3,659,976
$5,118,594
$2,145,078
Total Compensation
to Towe
147,615
6,470
21,440
32,435
18,360
Salary
95,900
5,400
17,600
16,900
15,600
Bonus
27,000
10,000
Profit Sharing
16,415
270
2,640
4,035
1,560
Director's Fees
8,300
800
1,200
1,500
1,200
1966
Bank Size
36,767,741
1,521,371
3,995,341
5,437,008
2,504,762
Total Compensation
to Towe
174,293
4,848
26,500
32,435
18,360
Sala ry
117,100
4,800
22,000
16,900
15,600
Bonus
30,000
10,000
Profit Sharing
18,893
48
3,300
4,035
1,560
Director's Fees
8,300
1,200
1,500
1,200
1967
Bank Size
40,039,718
2,082,566
4,235,901
6,339,479
2,716,834
Total Compensation
to Towe
180,550
5,565
25,500
32,435
16,160
Salary
126,000
5,000
22,000
16,900
13,600
Bonus
30,100
100
10,000
Profit Sharing
16,650
265
2,200
4,035
1,360
Director's Fees
7,800
300
1,200
1,500
1,200
1965
Bank Size
Total Compensation
to Towe
Salary
Bonus
Profit Sharing
Director's Fees
1966
Bank Size
Total Compensation
to Towe
Sala ry
Bonus
Profit Sharing
Director's Fees
1967
Bank Size
Total Compensation
to Towe
Salary
12,000
14,400
22,500
19,600
Bonus
Profit Sharing
Director's Fees
*223 Gallatin
Red Lodge
Reserve
Wibaux
(Plentywood) [1]
1965
Bank Size
$5,323,384
$4,189,387
$4,083.132
Total Compensation
to Towe
16,000
29,260
23,650
Salary
7,000
14,400
19,000
Bonus
7,000
10,000
Profit Sharing
1,400
3,660
2,850
Director's Fees
600
1,200
1,800
1966
Bank Size
6,102,013
4,392,796
$8,660,745
4,153,705
Total Compensation
to Towe
25,400
29,260
13,840
23,650
Salary
12,000
14,400
12,400
19,000
Bonus
10,000
10,000
Profit Sharing
2,200
3,660
1,240
2,850
Director's Fees
1,200
1,200
200
1,800
1967
Bank Size
6,004,187
4,955,626
9,004,404
4,700,721
Total Compensation
to Towe
24,200
28,040
25,350
23,300
Salary
12,000
14,400
22,500
19,600
Bonus
10,000
10,000
Profit Sharing
2,200
2,440
2,250
1,900
Director's Fees
1,200
600
1,800
Towe's average compensation (excluding director's fees and profit sharing) from each of the pertinent petitioner banks in 1967 compares with average bank compensation for comparable officials within the Sixth National Bank Region [2] as follows: Sixth National Bank
Region Average
Towe Average [3]
Towe Difference Banks - less than $5
million
$13,800
$16,940
22.8%
Banks - $5-10 million
18,000
23,800
32.2%
*224 Towe's average compensation (excluding director's fees and profit sharing) compares with the average bank compensation for comparable officials of Western N.A.B.A.C. [4] as follows: Western N.A.B.A.C.
Average
Towe Average [3]
Towe Difference Banks - less than $5
million
$13,732
16,940
23.4%
Banks - $5-10 million
18,680
23,800
27.4%
The average second officer of a western bank in 1967 received 60 percent to 80 percent of the chief executive's compensation according to the 1967 N. *225 A.B.A.C. Survey of Western Banks. The second officers (i.e., resident managers) of seven of the petitioner banks in 1967 received from 89.2 percent to 133 percent of the chief executive's compensation. In the eighth bank, i.e., Montana National Bank of Plentywood (the only bank in which the second officer did not own substantial equity), he received only 65.3 percent of the chief executive's compensation. The total officers' salaries of the combined petitioner banks represents a greater percentage of the petitioner banks' total assets than is reflected by the Montana bank average. Results are summarized as follows: Officers' Salary as Percent of Total Bank Assets
1965
1966
1967 All Montana banks
.60%
.61%
.61%
Petitioner banks
1.40%
1.16%
1.16%
The total officers' salary of the combined petitioner banks represents a greater percentage of total operating income of the petitioner banks than that of the Montana average as illustrated by the following table: Officers' Salary as Percent of Operating Income
1965
1966
1967 All Montana banks
12.2%
11.7%
11.5%
Petitioner banks
27.5%
24.0%
23.0%
The *226 total assets of the petitioner banks accounted for 2.1 percent in 1965, 2.8 percent in 1966, and 2.8 percent in 1967 of total Montana bank assets. At the same time, the total officer compensation in the petitioner banks accounted for 5.0 percent, 5.4 percent, and 5.3 percent of the total Montana bank officer compensation in the respective years. The petitioner banks collectively operate similarly to a bank holding company - they buy bonds on a group basis, they participate loans, there is a centralized office for recruiting, there is a system of self-audit within the chain, they centralize buying of supplies, and there is a growing similarity of names. A survey of four analogous western bank holding companies for the years 1965 through 1967 revealed that none of the officers approached Towe's total compensation even though all of the comparable bank officers managed larger bank chains. A summary of the above survey of western bank holding companies is set forth as follows: First Officer Salaries of Representative Bank Holding Companies
Proxy Statement Filed with SEC, 1965-67
(Limited to 2 Top Officers) [1]
Total $ Assets
Total Salary
$ of Total
Assets per
$ of Salary (000)
1965
Denver U.S. Bancorporation
5 Banks
461,857.9
R. D. Knight, Chairman
52,600
8,781
1966
Denver U.S. Bancorporation
498,025.5
R. D. Knight, Chairman
57,450
8,669
1967
Denver U.S.
555,066.7
Bankcorporation
R. D. Knight, Chairman
59,700
9,298
1965
Valley Bancorporation
Appleton, Wisconsin 6
55,572.2
Banks
Gus Zuehlke, President
H.C. and 4 Banks
NA
NA
1966
Valley Bancorporation
62,136.9
Gus Zuehlke, President
36,301
1,712
1967
Valley Bancorporation
73,021.8
Gus Zuehlke, President
44,718
1,633
1965
1st Bank Stock Corporation
Minneapolis, Minnesota
87 Banks - Minn., Montana,
South Dakota, & Wisconsin
2,416,549.3
G. Costikyan, President
90,811
26,611
1966
1st Bank Stock Corporation
2,561,675.5
G. Costikyan, President
92,155
27,797
1967
1st Bank Stock Corporation
2,932,564.6
G. Costikyan, President
102,473
28,618
1965
First Oklahoma
Bancorporation Oklahoma City, Oklahoma 2 Banks
449,717.7
C. A. Vose, Chairman
48,970
9,183
1966
1st Oklahoma
456,720.3
Bancorporation
C. A. Vose, Chairman
NA
NA
1967
1st Oklahoma
498,807.3
Bancorporation
C. A. Vose, Chairman
46,600
10,702
1965
Seven Banks, Montana
26,031
Ed Towe, President
147,615
176
1966
Eight Banks, Montana
36,768
Ed Towe, President
179,293
205
1967
Eight Banks, Montana
40,040
Ed Towe, President
180,550
222
*227 The survey of four western bank holding companies for the years 1965 through 1967 reveals that the amount of total assets managed per dollar of chief executive compensation ranged from $1,633 to $28,618. During these same years, for every dollar of Towe's compensation, he managed from $176 to $222 in assets. The following table details some representative Montana bank operating statistics for the years 1966 and 1967: Petr.
Petr.
Petr.
Montana
Bank
Mountain
Banks
Mountain
Banks
Area
Located
Area
Located
Area
Located
2501
in Area
2502
in Area
Area
in Area
2501 [1]
2502 [2]
2503
[3]
1966)
Bank Assets (000)
$517,588
6,102
$483,172
$24,752
$235,788
$5,914
1967)
558,508
6,004
529,156
26,997
254,844
7,038
1966)
Operating Income (000)
27,754
270.3
24,505
1,149.3
12,229
351.1
1967)
30,559
351.6
27,026
1,279.5
13,890
390.3
1966)
Officer Salaries (000)
3,221
66.6
2,950
277.2
1,390
85.4
1967)
3,474
75.0
3,231
292.8
1,533
97.1
1966)
Wages & Salaries (000)
6,529
100.5
5,303
372.6
2,958
109.4
1967)
7,064
121.1
5,642
388.4
3,224
125.5
1966)
Total Net Income After Tax (000)
4,162
12.7
3,786
165.6
1,713
21.1
1967)
4,334
19.1
4,094
198.8
1,446
30.2
1966)
Officer Salaries
as a Percentage
of Operating
11.6%
24.7%
12.0%
24.1%
11.4%
24.3%
Revenue
1967)
11.4%
21.9%
12.0%
22.9%
11.0%
24.9%
1966)
Wages & Salaries
as a Percentage
of Operating
23.5%
37.2%
21.6%
32.4%
24.2%
31.2%
Revenue
1967)
23.1%
34.4%
20.9%
30.4%
23.2%
32.2%
1966)
Net Income as a Percentage of Operating
15.0%
4.7%
15.4%
14.4%
14.0%
6.0%
Revenue
1967)
14.2%
5.4%
15.1%
15.5%
10.4%
7.7%
1966)
Net Income as a Percentage of
Total Assets
.80%
.21%
.78%
.67%
.72%
.36%
1967)
.77%
.32%
.77%
.74%
.56%
.43%
*228 The banking structure of Montana is dominated by a relatively large number of small banks (i.e., 132 in 1967). Some of these are formally organized as holding companies. The petitioner banks are characteristic of Montana banks in general, with respect to size, location and economic environment. During the years from 1965 through 1967 the petitioner banks earned less income as a percentage of assets than the average of all Montana banks. The comparison is as follows: Net Income as Percentage of Total Assets
1965
1966
1967 All Montana banks
.60
.79
.73
Petitioner banks
.39
.54
.62
During the years from 1965 through 1967 the petitioner banks earned less income as a percentage of revenue (operating income) than the average of all Montana banks. The results are summarized as follows: Net Income as Percentage of Revenue
1965
1966
1967 All Montana banks
12.3
15.2
13.9
Petitioner banks
7.7
11.2
12.3
Although the petitioner banks' assets in relation to total Montana bank assets accounted for 2.1 percent in *229 1965, 2.8 percent in 1966, and 2.8 percent in 1967, of the total, the petitioner banks' net income accounted for only 1.4 percent, 1.9 percent and 2.4 percent of total Montana bank income in these respective years. Petitioner banks grew in annual gross income and in total assets during the period of Towe's control until 1967. Each of the petitioner banks had experienced growth in annual gross income, and six of these banks had experienced growth in total assets in the years immediately prior to Towe's control. Four of the petitioner banks experienced a decrease in the average annual growth rate of gross income under Towe's control. The total officers' salaries for each petitioner bank increased substantially for the period of Towe's control through 1967. The least percentage of increase occurred in the petitioner Plentywood-Reserve Bank which had an average percentage increase of approximately 3 percent. The maximum percentage increase occurred in the petitioner Baker Bank which had an average increase of approximately 30 percent. The trend during Towe's control was in increasing the portion of assets reflected by loans, stocks and bonds (particularly locally unrated *230 municipal bonds), with a decreasing portion of assets in United States securities. Towe consulted periodically during the years in issue with his resident managers in connection with loans. On a monthly basis he reviewed in detail all loans over $1,000 and discussed in detail "the merits of the loans * * * what the loan is for and further discussion * * * if there is any question about the merit of it or anything like that." Similarly, he participated in the decision of whether loans should be made - primarily large loans and borderline loans or any loan in which the resident manager had a question. Moreover, he frequently visited with the propective borrowers in the process of determining whether a loan should be made. During the period 1965 through 1967 Towe personally inspected all major loans. Towe reviewed the expenses of each bank on a monthly basis. He frequently attended municipal bond sales. The average municipal bond portfolio of the petitioner banks is approximately $1,000,000. The investment in municipals is profitable, but not liquid. During the period from 1965 through 1967, Towe personally negotiated for the purchase by the petitioner banks of office *231 supplies such as stationery, calendars, checks, deposit tickets, typewriters and other machines. For example, sometime during the period from 1965 through 1967 Towe personally went to Omaha, Nebraska, to purchase typewriters and physically delivered the typewriters to the recipient petitioner banks. Towe also generally interviewed applicants for junior officers. He personally maintained a file on employee applications. Towe personally discussed with his associates plans for bank buildings, determining how they should be built and to whom specific building contracts should be let. In addition, he negotiated directly with the architects. During the period from 1965 through 1967, Towe personally engaged in skip-tracing (i.e., the process of tracing down persons who have moved from the area and whose loan is delinquent.) Towe engaged in this activity for each of the petitioner banks. Towe also reviewed monthly the petitioner banks' cash items. Towe personally guaranteed the petitioner banks' worthless loans. During the period from 1965 through 1967, Towe personally engaged in the repossession of collateral. Moreover, during these years, Towe personally manufactured *232 keys for safety deposit boxes at the petitioner banks, and also personally drilled out safety boxes when the keys had been lost. Towe drove from 75,000 miles to 90,000 miles annually during 1965, 1966 and 1967. The largest portion of these miles was sustained in driving to and from the various petitioner banks (e.g., in attending municipal bond auctions, in skip- tracing, and in performing other bank-connected functions.) It was Towe's practice upon the acquisition of a bank to substantially increase the volume of loans and, in some cases, to double or triple them. Towe viewed his relations with his resident managers as a partnership operation. For example, he had his resident manager draw the same salary because we [Towe and his respective resident managers] operate as equal partners. And should be entitled to an equal salary in that they put their time up against my expertise and my original effort to have put them in the position that they are. In effect, each of the petitioner banks is "operated as a partnership" and "treated as a partnership." No formula was used to determine the compensation to be paid to Towe and his resident managers for services rendered, *233 either in terms of profits, time spent or services rendered. Similarly, no particular method was employed to determine the bonuses to be paid at the end of the year. During the years 1965 through 1967 Towe's salary was not determined on the basis of the size of the respective petitioner banks. During the years in issue the tendency of the petitioner banks to have large municipal bond accounts and liberal lending policies subjected some of the petitioner banks to criticism by the pertinent State and/or Federal banking authorities. The reason for such criticism is the fact that the higher bond accounts and more liberal lending policy reduces the liquidity of a bank and make it more susceptible of a run in the event of a recession. In fact the criticism of the banking authorities led certain of the resident managers to resign. In 1966 Towe employed an assistant, William G. Westrum ("Westrum"). Westrum was paid $1,200 per month, or $100 from each of the then 12 banks in which Towe had an interest. Including bonuses and director's fees, Westrum's salary was approximately $22,000 to $23,000 annually. In 1967 he was replaced by Ambrose Heimer who performed the same service at *234 approximately the same salary. Such salary was not disallowed by the respondent in the notices of deficiency. During the years 1965 through 1967 Towe spent a considerable amount of activity in collecting antique Fords. He commenced acquiring antique Fords in 1950 and by 1966 had arranged for the exhibition of 32 of his cars by the State of Montana. During the period 1965 through 1967 he acquired on the average of from 1 to 5 cars a year. At the time of trial he owned between 85 and 100 antique cars. The cars were acquired throughout the United States. During the years 1965 through 1967 Towe's wife was an assistant cashier at the petitioner Circle Bank and was paid for those services. In addition, she was a director of the petitioner Circle, Wibaux, Baker and Plentywood Banks and for those services she also received compensation. Similarly the Towe children were directors of many of the petitioner banks. One daughter who was such a director was at the time a resident of North Carolina. During the years 1965 through 1967 loans were made by the petitioner Circle Bank to the Towe children in the approximate amount of $180,000. The purpose of the loan was to purchase stock *235 in the Bank of Reserve. This loan was subsequently criticized by the Federal banking authorities. Moreover, during this period of time, the petitioner Baker Bank loaned the Towe children $250,000. The purpose of the loan was to buy stock in the petitioner Plentywood Bank. The notes signed by the children were not interest-bearing. In 1967 the Federal banking authorities asked the petitioner Baker Bank to remove these loans from their loan account. During the years 1965 through 1967 the petitioner banks were also criticized by State and Federal banking authorities for the large salaries being paid to Towe and to the resident managers. The State and/or Federal banking authorities have also criticized the petitioner banks' undercapitalization, sub-standard loans and the slow rate of the petitioner banks' capital account as opposed to the rapid growth of the petitioner banks' deposits and loans. On April 1, 1967, Quade and Jones purchased a controlling stock interest in the petitioner Ekalaka Bank. Quade and Jones, with their respective wives, each acquired 457 of the 1,000 outstanding shares of $100 par value stock, at a total cost to each of $137,100. To effect the purchase *236 they borrowed the following sums: Borrower
Northwestern National Bank of Minnesota
Baker National Bank
Quade
$103,684
-
Jones
90,000
$10,000
The remaining 86 outstanding shares were owned by other parties. Prior to the purchase Quade was a cashier of the petitioner Wibaux Bank and Jones was the president of the petitioner Wibaux Bank. Jones and Quade had no banking experience prior to commencing work at the petitioner Wibaux Bank. Both men received their banking education under the guidance of Towe. The petitioner Ekalaka Bank is operated after the fashion of the other petitioner banks. As president of the petitioner Ekalaka Bank, Quade received compensation, in the form of a salary and bonus, in the total amounts of $21,000 in 1967, $27,000 in 1968 and $29,400 in 1969. As vice-presidnet of the petitioner Ekalaka Bank, Jones received compensation, in the form of a salary and bonus, in the total amounts of $16,500 in 1967, $21,000 in 1968, and $21,200 in 1969. The amounts paid to themselves and other employees of the petitioner Ekalaka Bank as compensation were determined, with the benefit of formulae, by Quade and Jones. The compensation *237 paid was substantially greater than amounts paid to officers and employees prior to 1967. Jones' experience and knowledge in the banking industry has come "through my association with Mr. Towe, primarily, and what I have gained from the school of hard knocks." He had no association with the banking industry prior to his association with Towe. Jones is indirectly related to Towe; Towe's son is married to the sister of Jones' wife. During the years 1967 through 1969 Jones skip-traced loans for the petitioner Wibaux and Ekalaka Banks; he collected loans for the petitioner Ekalaka Bank; he picked up office equipment in Omaha, Nebraska, for the petitioner Ekalaka Bank; he constructed shelving for additional bank space; and he "helped promote" the bank's western decor by purchasing a set of Longhorns for the bank's lobby. No particular method was employed to determine the salary increases at either the petitioner Wibaux Bank or the petitioner Ekalaka Bank for either Jones or Towe. Jones regularly attended bond sales for the petitioner Wibaux and Ekalaka Banks. Jones personally also paraded antique automobiles on behalf of the petitioner Ekalaka Bank and otherwise performed *238 odd jobs around the petitioner Ekalaka Bank. The Bancorporation of Montana ("the Bancorporation") is a publicly owned corporation having approximately 11 banks. Charles Rubie ("Rubie") is its principal executive officer. During the years 1965 through 1967 there were 7 banks in the chain. Beginning in 1964 the Bancorporation adopted a deliberate policy of restricting loans in view of inflationary economic factors. The policy had a depressing effect on earnings. In an inflationary economy the demand for loans accelerates and the Bancorporation preferred liquidity at the expense of profit. Approximately 10 percent to 20 percent of the Bancorporation's bond portfolio was comprised of local Montana bonds during 1965 through 1967. During the period 1965 through 1967 the Bancorporation's bond portfolio was composed of shorter term bonds to maintain greater liquidity. Rubie did not personally engage in such tasks as skip-tracing, personal collection of notes, or personal delivery of typewriters to the various member banks of the Bancorporation. In 1967 Rubie's salary was approximately $17,000 to $18,000. CATTLE VALUATION ISSUE On his Federal income tax returns for 1965 *239 through 1967 Towe deducted an amount of $500 a head for cows donated to the School, an organization qualifying as a charitable organization under the provision of section 170(c) of the Internal Revenue Code of 1954. [5] The deduction was arrived at by computing the average sales of all registered Hereford cows in the nation. The total charitable deductions claimed for the donation of cows to the School during the years in issue are as follows: Year
Cows Donated
Claimed Value per Animal Total Deductions
for Cows Donated 1965
28
$500
$14,000
1966
27
500
13,500
1967
36
500
18,000
During the years 1965 through 1967 Towe filled out a transfer certificate requesting the American Hereford Association to deliver to the School registration certificates with respect to registered Hereford cows being grazed on ranches located in South Dakota and Montana. The School is a four-year boarding high school operated by the Society of Friends. Four of the Towe children attended such school at various times. In 1966 Towe was engaged in two ranching endeavors *240 - the Brooks Ranch in Lantry, South Dakota, and the Ferguson Ranch in McCone Count, Montana. The Brooks Ranch is owned by Brooks but Towe's cattle are kept on the ranch on a share basis.Brooks furnishes all feed and labor in return for two-thirds of the calf crop. Towe has first pick of the calves. Towe furnishes the bulls for his cattle; pays veterinarian expenses; pays for registration costs, taxes on his cattle, horn weights, tatoo equipment and ear tags; and assists in the branding. The Ferguson Ranch was owned during the pertinent years in issue by Towe Farms, Incorporated ("Towe Farms"), a corporation owned and controlled by Towe and his children. At the end of 1967 the stock ownership was as follows: Stockholder
Address
Percent Owned Edward Towe (father)
Circle, Mont.
1.0
Florence Towe (mother)
Circle, Mont.
1.0
Thomas E. Towe (son)
Billings, Mont.
19.6
Karen Towe James (daughter)
Corvallis, Ore.
19.6
Kristin Towe Hartley (daughter)
Durham, N.C.
19.6
Sara Towe Muzumdar (daughter)
Bozeman, Mont.
19.6
Andrew C. Towe (son)
Circle, Mont.
19.6
Towe leased the land from Towe Farms during the pertinent years in issue. He provided *241 the land, Ferguson (the former owner of the Ferguson Ranch) provided the labor, and each party provided the same number of cattle and each were to receive the calves from their respective cows. With respect to the School's cattle on the Ferguson Ranch, Towe assumed their management and received two-thirds of the calf crop and the School received their pick of the heifers. Towe selected the heifers. Proceeds from the sale of any cattle donated to the School were always deposited to the account of the School maintained at the petitioner Circle Bank. Towe's name is not on the signature card. After Towe's two-thirds pick, the calf crop of the 91 cows donated to the School was always sold to the Towe children for prices ranging from $100 to $150 per head. The 1966 calf crop was sold to one of the children for $125 per head and the 1967 calf crop was sold to another child for $125 per head. A smaller boned animal would generally have greater longevity than a large animal. The cows donated, as indicated by their pedigrees, were of average size. The cattle herd from which donations were made to the School was of average quality for purebred Hereford cattle. NET OPERATING LOSS *242 CARRYFORWARD ISSUE The petitioner Plentywood Bank (formerly Reserve) incurred a loss on its 1966 Federal income tax return of $21,283.40. For its taxable year 1963 the above petitioner bank had taxable income of $23,748.70. PENSION AND PROFIT SHARING TRUST ISSUE The controlling provisions of the respective profit-sharing plans' trust agreements of the following petitioner banks are substantially the same: First Security Bank of Red Lodge, First National Bank of Reserve, First National Bank of Circle, Fairview Bank, Montana National Bank of Absarokee, Baker National Bank, and Gallatin Trust & Savings Bank. The respective profit-sharing plans' trust agreements provide in pertinent part as follows: It shall be impossible at any time prior to the satisfaction of all liabilities hereunder, for any part of the income or corpus of this Trust to be used or diverted to a purpose other than for the exclusive benefit of the employees of the bank or their beneficiaries. * * * In no event shall the principal or income of the Trust or any payment by the Bank to the Trust, be paid or revert to the Bank, or be used for any purpose whatsoever, other than for the exclusive benfit *243 of the participants, their beneficiaries or estate. All corpus and income from the respective profit-sharing trusts are deposited in an account designated as C.W.D.M. Trust Fund. The only records of C.W.D.M. are a bank account in the name of C.W.D.M., Edward Towe, trustee; cancelled checks; deposit tickets; the normal records maintained by the bank with respect to a bank account; and summary records prepared after the audit of these cases. C.W.D.M. has never filed State or Federal income tax returns or information returns. All corpus, and income therefrom, deposited in the account of C.W.D.M. was reinvested in the Grant Investment Fund ("the Grant Fund"), except to the extent that the respective corporate income tax returns show that amounts were paid for benefits. The Grant Fund is managed by Towe. It maintains no formal loan account ledger. The Grant Fund filed no State or Federal income tax returns or information returns until after the issues concerning the exempt status of the respective petitioner profit-sharing trusts were raised by the Internal Revenue Service during the preliminary stage of the instant case. The Grant Fund yielded the following percentage *244 investment returns during the years 1966 through 1969: Year
Percentage of Return on Investment 1966
7.9
1967
8.3
1968
7.8
1969
9.1
In 1966 the Grant Fund loaned Towe Farms $99,900 to purchase the Ferguson Ranch. Towe Farms, acting through its secretary, Towe, executed a note on January 1, 1972, payable to Meyer & Chapman State Bank in the amount of $99,900. No security or collateral was provided for the loan. Towe Farms has transferred to the Grant Fund sufficient cattle to satisfy all interest payments computed at a per annum rate of 6 percent due through April 25, 1973. On December 7, 1966, the State bank examiner for the State of Montana sent a notice to the Belgrade State Bank stating that in impairment of capital existed in the amount of $102,821.59, which the bank was required to eliminate by March 6, 1967. In December 1966 Towe acquired a controlling interest in the Belgrade State Bank. The impairment of the Belgrade State Bank's capital resulted from loans classified by the bank examiners as doubtful loans, substandard loans or loss loans. *245 The comptroller of the currency classifies loans on the basis of the probability that they can be collected. A doubtful loan is one in which payment has to be worked out between the creditor and debtor. A substandard loan is one in which there is a 50 percent chance the loan will not be paid. A loss loan is a loan considered by the bank examiner to be without chance of repayment. A total of $146,300 of the doubtful, substandard and loss loans were sold in February 1967 by the Belgrade State Bank to the Grant Fund and to several of the petitioner banks in order to eliminate them from the books of the Belgrade State Bank. Out of the $146,300 total, loans with a value of $40,438.93 were sold at face amount to the Grant Fund. All of these loans were either endorsed or guaranteed by both Towe and the bank's resident manager. All of the Belgrade State Bank's loans sold to the Grant Fund were paid either by the borrowers or the guarantors, including all accrued interest, without any loss to the Grant Fund. During the years 1966 through 1969 the Grant Fund made no bad debt charge-offs. All of the loans purchased by the Grant Fund from the various petitioner banks were either endorsed *246 or guaranteed both by Towe and the pertinent petitioner bank's resident manager. In 1966 the petitioner Absarokee Bank had an outstanding indebtedness from John G. Gountanis ("the Gountanis loan") of approximately $40,000. In 1966 it was recognized that the debt was bad. The loan was sold to the Grant Fund in 1966 for approximately $26,500. All but approximately $14,000 of the Gountanis loan has been paid by the borrower, including all accrued interest. The remaining outstanding principal is secured by Gountanis' rights to insurance commissions. Respondent, in his statutory notices mailed to the respective petitioner banks and to petitioner Towe, determined as follows: (1) that the compensation deductions taken by the pertinent petitioner banks for salaries paid during the pertinent years in issue to Towe, Jones and/or Quade were excessive; (2) that Towe's charitable deductions for cows donated to the School during the pertinent years in issue were excessive; (3) that petitioner Plentywood Bank was not properly entitled to a net operating loss carryforward from the year 1966 to the year 1967; and (4) that a portion of the respective petitioner banks' contributions *247 to their respective profit-sharing plans should be disallowed on the basis that the excess amount was not deemed to have represented reasonable compensation for services rendered during the pertinent years in issue. By amended answer, respondent alleged that the involved profit-sharing plans were not qualified plans within the meaning of section 401 for the year 1967; and, therefore, that the entire amount of the contributions by the respective petitioner banks to their respective profit-sharing plans was not properly deductible under section 404 for 1967. [6]
Finally, in his notices of deficiency dated May 3, 1972, that were issued to the respective petitioner profit-sharing trusts, respondent revoked the tax-exempt status of the respective profit-sharing trusts and asserted deficiencies to reflect the claimed adjustments to the trusts' income. ULTIMATE FINDINGS OF FACT 1. The aggregate compensation received *248 by Towe from the petitioner banks as a collective group constituted reasonable compensation for services rendered only to the extent of $90,000 for 1965, $100,000 for 1966, and $110,000 for 1967. [7]
2. Amounts paid to Jones by petitioner Wibaux Bank for services rendered during the years 1965 and 1966 constituted reasonable compensation. 3. Amounts paid to Jones by petitioner Wibaux Bank for services rendered during the year 1967 constituted reasonable compensation only to the extent of $21,000. 4. Amounts paid to Jones by petitioner Ekalaka Bank for services rendered during the years 1967, 1968 and 1969 constituted reasonable compensation only to the extent of $12,000, $14,000, and $16,000, respectively. 5. Amounts paid to Quade by petitioner Ekalaka Bank for services rendered during the years 1967, 1968 and 1969 constituted reasonable compensation. 6. The fair market value of the cows donated by Towe to the School during the years *249 1965, 1966 and 1967 was $415 per cow during 1965 and 1966 and $437 per cow during 1967. 7. Petitioner Plentywood Bank was not entitled to carry forward its net operating loss for the year 1966 to the year 1967. OPINION With respect to the reasonable compensation issue, respondent's determinations have disallowed: (1) all of the pertinent petitioner banks' aggregate compensatory payments to Towe for the years 1965, 1966 and 1967 which were in excess of $36,950, $39,300, and $44,200, respectively; [8]
(2) petitioner Wibaux Bank's compensatory payments to Jones for the years 1965, 1966 and 1967 which were in excess of $12,000 for each of these years; (3) petitioner Ekalaka Bank's compensatory payments to Jones for the years 1967, 1968 and 1969 which were in excess of $3,400, $4,688 and $4,875, respectively; and (4) petitioner Ekalaka Bank's compensatory payments to Quade for the years 1967, 1968 and 1969 which were in excess of $13,640, $18,750 and $19,500, respectively. *250 The basic question confronting this Court with respect to this issue is whether the amounts paid to Towe, Jones and/or Quade as salary, bonuses, director's fees, and/or contributions to profit-sharing plans constituted "reasonable [allowances] * * * for personal services actually rendered." Section 162(a). Whether amounts paid employees represent reasonable compensation for services rendered is a question of fact to be determined on the basis of the particular circumstances in each case. Huckins Tool and Die, Inc. v. Commissioner, 289 F.2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; Long Island Drug C. v. Commissioner, 111 F.2d 593 (C.A. 2, 1940), affirming 35 B.T.A. 328 (1937), certiorari denied 311 U.S. 680 (1940); Geiger & Peters, Inc., 27 T.C. 911 (1957); Salem Packing Co., 56 T.C. 131 (1971); Dielectric Materials Co., 57 T.C. 587 (1972); and Pepsi-Cola Bottling Company of Salina, Inc., 61 T.C. 564 (1974). The instant case does not require extended *251 discussion of the particular facts in the above cases or in the many other cases on this subject; each of them, as well as the instant case, turns on its own facts. However, certain factors for consideration are repeated over and over in the cases. The weight to be accorded each of such factors of course does vary with the circumstances of the other factors there present, and no one factor is conclusive. A rather comprehensive listing of pertinent factors for consideration is found in Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (C.A. 6, 1949). This case reversed a Memorandum Opinion of this Court, but the factors for consideration there listed have been reviewed and adopted by this Court on countless occasions. The factors are listed in the following language: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's *252 work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir., 32 F.2d 42, 45, 68 A.L.R. 696; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 172; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131 F.2d 712, 715. The situation must be considered as a whole with no single factor decisive. [Mayson Mfg. Co. v. Commissioner, 15 119] After having carefully examined the factors enumerated in Mayson Mfg. Co. and the record as a whole, we are persuaded that respondent *253 substantially undervalued the value of the services rendered by Towe to the pertinent petitioner banks during 1965, 1966 and 1967. On the other hand, however, we are also persuaded that Towe's services rendered to the pertinent petitioner banks during these three years cannot reasonably be valued at the amounts claimed by Towe - i.e., $147,615 in 1965, $174,293 in 1966, and $180,550 in 1967. After examining the testimony of the respective parties' expert witnesses and the other relevant portions of the record in this regard, we cannot ignore that Towe's diligence and hard work certainly contributed to the success achieved by the petitioner banks during the pertinent years in issue. In this regard, we note that the petitioner banks increased their respective income and assets during these years. On the other hand, we also must observe that some of the success of the petitioner banks during the years in issue must be attributable to inflation. Moreover, we further note that the functions performed by Towe for the pertinent petitioner banks during the years in issue did not, and still do not, require the attention of a top executive official of Towe's capacity. In this context, *254 we refer, as examples, to the facts: (1) that Towe, after purchasing typewriters for the petitioner banks, personally brought the typewriters from Omaha, Nebraska, to Montana and personally delivered the typewriters to the recipient petitioner banks; (2) that Towe personally made keys for safety deposit boxes for the pertinent petitioner banks; (3) that Towe personally drilled out safety deposit boxes for each of the pertinent petitioner banks; and (4) that Towe would in some instances travel long distances to collect relatively minor debts for the pertinent petitioner banks. Finally, we think that it is relevant to observe (1) that Towe's average compensation for 1967 was substantially higher than that received by comparable bank officials in comparable Western N.A.B.A.C. banks, and (2) that Towe's aggregate compensation from the petitioner banks during each of the years in issue was substantially larger than that of the chief executive officer of analogous western bank-holding companies. After carefully considering all of the relevant facts and circumstances relating to Towe's activities and posture within the pertinent petitioner banks, we have found, and so hold, that Towe *255 was entitled to an aggregate reasonable compensation (excluding director's fees) from the pertinent petitioner banks of $90,000 for 1965, $100,000 for 1966 and $110,000 for 1967. Furthermore, after carefully examining the relevant portions of the record pertaining to the compensatory amounts paid by the petitioner Wibaux Bank to Jones during 1965 and 1966 and by the petitioner Ekalaka Bank to Quade during 1967, 1968 and 1969, we are convinced that all of these amounts constituted reasonable compensation. [9] We were persuaded to reach this conclusion by the concession of respondent's expert witness at trial that although the petitioner banks' second officers were well paid, they were not, in his opinion, overpaid. The precise wording of this concession is contained in the following excerpt from the direct examination of respondent's expert: I'm not so sure that this demonstrates much, except to point out that what's a salary such as Mr. Towe was paid by these banks equivalent if he had been there all the time. And it does give some demonstration relative to these associates of his who actually do spend full time in the banks. I just put it there for, really, demonstration purposes. *256 I'm not - I do have an inference I drew from it, and that is, Mr. Brennan, when the case - when I first came out to talk to him really, it was very - I'm not so sure it was Mr. Brenna, but Mr. Brennan's associates were very eager for me to prove a case that the second officers were over-paid as well. And unfortunately for the Government's case, I could not come to any such conclusion. I felt that - I agreed they were highly paid, and the averages relative to the N.A.B.A.C. figures show they're highly paid, but I will not swear they're over paid. I do not think they're over-paid. I just think they're paid very well. So, I dropped that other case on the grounds that, really, the comparison is between an officer who spends full time at the bank as opposed to Mr. Towe, who does not. [10]
*257 On the other hand, however, we were unable to conclude that the compensatory amounts paid by the petitioner Wibaux Bank to Jones in 1967 and by the petitioner Ekalaka Bank to Jones in 1967, 1968 and 1969 constituted reasonable compensation. The concession of respondent's expert is inapplicable to Jones in this context, specifically because Jones was not employed in a full-time capacity by either of the pertinent petitioner banks during 1967, 1968 and/or 1969. Petitioners strenuously argue that the fact Jones was employed in a part-time capacity by the petitioner Wibaux and Ekalaka Banks during the pertinent years in issue should not control the determination of whether the compensatory amounts received by Jones from these banks constituted reasonable compensation. We agree that this factor is not the controlling consideration; however, it does merit some consideration in the overall analysis. After examining the record it is apparent that Jones devoted a substantial portion of his working time in performing functions that do not merit the attention of a top level executive such as Jones. For example, (1) he picked up office equipment in Omaha, Nebraska, for the petitioner *258 Ekalaka Bank; (2) he constructed shelving for additional bank space; and (3) he "helped promote" the bank's western decor by purchasing a set of Longhorns for the pertinent bank's lobby. After carefully considering these and other such facts in conjunction with the fact that Jones was not employed on a full-time basis by either the petitioner Wibaux Bank or the petitioner Ekalaka Bank during 1967, 1968 or 1969, we have found, and so hold, that Jones' compensation from the pertinent petitioner banks for the years in issue was reasonable only to the following extent: Year
Bank
Amount of Jones' Reasonable Compensation 1967
Wibaux
$ 21,000
1967
Ekalaka
12,000
1968
Ekalaka
14,000
1969
Ekalaka
16,000
With respect to the value of the cows donated by Towe to the School during 1965, 1966 and 1967, we have carefully examined all of the relevant facts and circumstances contained in the record regarding this issue. After consideraing all of these facts, we have concluded that the fair market value of each cow donated to the School by Towe in 1965, 1966 and 1967 was $415 in 1965 and 1966 and $437 in 1967. With respect to the issue of whether the petitioner *259 Plentywood Bank was entitled to a net operating loss carryforward to its 1967 taxable year, it is clear that the petitioner Plentywood Bank is not entitled to the claimed net operating loss carryforward. Sections 172(b) (1) (A) (i) and 172(b) (1) (B)[11] provide in essence that a post-1957 net operating loss is subject to a three-year carryback and a five-year carryforward provision. Section 172(b) (2)[12] provides that a net operating loss shall be carried to the earliest of the taxable years to which the loss may be carried and that only the remaining excess can be carried to the remaining eligible carryback and carryforward years. Accordingly, under these provisions, it is clear that we must first examine the petitioner Plentywood Bank's taxable years 1963, 1964 and 1965 (i.e., the earliest chronological taxable years to which the petitioner Plentywood Bank's 1966 net operating loss could be carried). Since the petitioner Plentywood Bank did have sufficient taxable income for its 1963 taxable year to absorb the entire 1966 net operating loss, it is apparent that there is no excess which *260 would be available for carrying forward to the year 1967. Accordingly, we sustain respondent's determination that the petitioner Plentywood Bank is not properly entitled to a net operating loss carryforward for its taxable year 1967. [13]
*261 The two remaining issues for disposition involve most of the petitioner banks and their respective profit-sharing plans. These issues are as follows: (1) whether the deductions taken by the pertinent petitioner banks for contributions to their respective profit-sharing plans should be disallowed either partially or entirely for the pertinent years in issue; and (2) whether the involved petitioner profit-sharing trusts are subject to income taxation for the year 1967 (i.e., whether the tax-exempt status of these respective profit-sharing trusts was properly revoked by respondent effective as of their 1967 taxable year). Respondent contends that the deductions claimed by the pertinent petitioner banks for contributions to their respective profit-sharing trusts during the pertinent years in issue should be disallowed in their entirety. Respondent supports this contention in effect by the following arguments: (1) that the funds of the petitioner profit-sharing trusts that were invested in the Grant Fund were not used exclusively for the benefit of the employees participating in the respective profit-sharing plans; and (2) that, even if the exclusive benefit argument is rejected, *262 the petitioner profit-sharing trusts engaged in "prohibited transactions" within the meaning of section 503(b). Section 401(a) provides that: A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section * * * [Emphasis added] Section 503(a) (1) (B)[14] provides that: An organization described in section 401(a) shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after March 1, 1954. Section 503(b)[15] defines the term "prohibited transaction." *263 After carefully considering the various aspects of sections 401(a) and 503(b), we have concluded that the questioned transactions between specific banks in which Towe had an equity interest and the Grant Fund neither contravened section 401(a) nor section 503(b). In reaching this conclusion we examined closely a number of transactions, including the following transactions emphasized by respondent: (1) the loan of $99,900 by the Grant Fund to Towe Farms in 1966; (2) the sale at face value to the Grant Fund by the Belgrade State Bank of $40,438.93 of substandard loans; and (3) the sale in 1966 by the petitioner Absarokee Bank to the Grant Fund of the approximately $40,000 Gountanis loan for a consideration of approximately $26,500. A qualified plan may lose its exemption if it is administered or operated in a way that violates the fundamental purpose of Congress in enacting section 401. Time Oil Co., 26 T.C. 1061 (1956), remanded on other grounds 258 F.2d 237 (C.A. 9, 1958); [16] see Sherwood Swan & Co., 42 T.C. 299, 306 (1964), affd, per curiam *264 352 F.2d 306 (C.A. 9, 1965). After considering these various transactions in light of this standard, we are persuaded that the above-enumerated loan and purchases by the Grant Fund did not precipitate a violation of the exclusive benefit language of section 401(a). The Grant Fund did not experience any bad debt chargeoffs during the pertinent years in issue. Moreover, the record indicates (1) *265 that all loans sold by the pertinent petitioner banks to the Grant Fund were either endorsed or guaranteed by both Towe and the resident manager of the specific bank; and (2) that the Grant Fund averaged earnings of 9.1 percent in 1969, 7.8 percent in 1968, 8.3 percent in 1967, and 7.9 percent in 1966. Thus, since the Grant Fund has not experienced any loss whatsoever either in interest or in principal from the Towe Farms, Goutanis and/or the Belgrade State Bank loans, we have concluded that there is no justifiable basis for using these transactions as the ground (or grounds) for disallowing the deductions taken by the respective petitioner banks to their profit-sharing trusts. Moreover, we are further convinced that section 503(b) is inapplicable under the instant facts. Even if we were to completely disregard both C.W.D.M. and the Grant Fund as entities (due to the fact that Towe served as trustee of all the pertinent petitioner profit-sharing trusts, as trustee of C.W.D.M. and as manager of the Grant Fund), we cannot ignore the dictates of section 503(b). Section 503(b) provides that a prohibited transaction occurs only when the profit-sharing trust engages in one or more *266 of the transactions specified in section 503(b) with any of the entities and/or persons described in the flush language of section 503(b). We have concluded that, with respect to both the Towe Farms and the Belgrade State Bank transactions, the requisites of the flush language of section 503(b) are not satisfied. Regarding both of these loans (assuming that C.W.D.M. and the Grant Fund are ignored as entities, and further assuming that the indicated loans are determined to have been made on a pro-rata basis by the respective petitioner profit-sharing trusts), neither recipient of the two transactions (i.e., neither Towe Farms as recipient of a loan nor Belgrade State Bank as recipient of the proceeds from the sale of its inventoried substandard loans) qualifies as an entity or person specified in the flush language of section 503(b). [17]
*267 With respect to the petitioner Absarokee Bank's sale of the Gountanis loan to the Grant Fund in 1966, we recognize that the petitioner Absarokee Bank would constitute an entity specified in the flush language of section 503(b) (i.e., the petitioner Absarokee Bank is the creator of the Absarokee Bank's profit-sharing trust). Nevertheless, even if we were to disregard C.W.D.M. and the Grant Fund as entities and even if we thus assumed that the petitioner Absarokee Bank's profit-sharing trust purchased the Gountanis loan from the petitioner Absarokee Bank, we are persuaded that this transaction does not fall within the ambit of those prohibited transactions enumerated in section 503(b). After considering (1) that Towe and the Absarokee Bank's resident manager both either endorsed or guaranteed the Gountanis loan, (2) that all but $14,000 of the principal on the Gountanis loan, plus all accrued interest, has been discharged, and (3) that the outstanding remainder of the Gountanis loan is secured by Gountanis' right to insurance commissions, we have concluded that this transaction is not proscribed by section 503(b). Accordingly, we hold that the pertinent petitioner banks are entitled *268 to deductions for contributions to their respective profit-sharing trusts during the pertinent years in issue. [18]
Finally, the preceding considerations which controlled our disposition of the deductibility of the contributions by the pertinent petitioner banks to their respective profit-sharing trusts also control our disposition of the issue regarding whether the tax-exempt status of the pertinent profit-sharing trusts should be revoked effective as of their 1967 taxable year. Accordingly, based on the facts presented in this record with respect to the actual year before us at this time, we hold that the tax-exempt status of the petitioner profit-sharing trusts should not be revoked, and that the *269 petitioner profit-sharing trusts, thus, are not subject to income taxation for their 1967 taxable year. Decisions will be entered under Rule 155. Footnotes
1. The cases of the following petitioners are consolidated herein: Fairview Bank, Docket No. 2808-69; The First National Bank of Circle, Docket No. 2809-69; First Security Bank of Red Lodge, Docket No. 2810-69; First National Bank of Wibaux, Docket No. 2811-69; Gallatin Trust and Savings Bank, Docket No. 2812-69; Montana National Bank of Absarokee, Docket No. 2813-69; Montana National Bank of Plentywood, Docket No. 2814-69; Edward Towe and Florence Towe, Docket No. 2815-69; First National Bank of Ekalaka, Docket No. 1910-72; First Security Bank of Red Lodge Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6300-72; First National Bank of Circle Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6301-72; Montana National Bank of Absarokee Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6302-72; First National Bank of Reserve Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6303-72; Fairview Bank Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6304-72; Baker National Bank Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6305-72; and Gallatin Trust and Savings Bank Profit Sharing Plan and Trust, Edward Towe, Trustee, Docket No. 6306-72. ↩
1. Respondent by amended answers filed July 23, 1973, asked for increased deficiencies as shown. The Sixth National Bank Region consists of Georgia, South Carolina and Florida. The average compensation figures for Towe as indicated in both of these comparative tables do not take into account the fact that Towe devoted only part of his aggregate available time to each of the pertinent petitioner banks. [3] The average compensation figures for Towe as indicated in both of these comparative tables do not take into account the fact that Towe devoted only part of his aggregate available time to each of the pertinent petitioner banks. [2] Addition to tax under sec. 6651(a), I.R.C. 1954↩. 1. Bank not acquired in 1965. ↩
4. "N.A.B.A.C." represents the abbreviated term for the National Association of Bank Auditors and Controllers. ↩
1. SEC requirements are that all officer salaries greater than $30,000 must be included in proxy materials. Salaries include all payments including contributions to profit sharing pension funds. ↩
1. Gallatin ↩
2. Baker, Circle, Fairview, Reserve, Wibaux ↩
3. Red Lodge, Absarokee ↩
5. All section references are to the Internal Revenue Code of 1954. ↩
6. Since respondent has introduced this matter by amended answer, he has the burden of proof with respect to this issue. See Pepsi-Cola Co., 5 T.C. 190 (1945), affirmed without discussion of this point in 155 F.2d 921↩ (C.A. 2, 1946). 7. In addition to the $90,000, $100,000 and $110,000 reasonable compensation amounts for 1965, 1966 and 1967, respectively, this Court has found that Towe also was properly entitled to director's fees for each of the years in issue. ↩
8. Respondent's expert testified at trial that in his opinion the aggregate reasonable compensation for Towe during 1965, 1966 and 1967 should have been $39,609, $51,390 and $53,860, respectively. ↩
9. Respondent makes the alternative argument that, even if Jones' and/or Quade's compensation during the years in issue is determined to be reasonable, part of the reasonable compensation should be disallowed on the basis that the disallowed portion was not received for services rendered. We are not persuaded by the argument. After examining all of the pertinent evidence, we are convinced that to the extent that Jones and Quade received reasonable compensation during the years in issue, all of such reasonable compensation was attributable to services rendered. ↩
10. Although Quade was not the second officer at the petitioner Ekalaka Bank (i.e., Towe had no interest in the petitioner Ekalaka Bank), the concession of respondent's expert is conceptually applicable to Quade since Quade was employed by the Ekalaka Bank on a full-time basis after he and Jones acquired the Ekalaka Bank. Thus, even though Quade may have been highly paid, we have concluded that he was not overpaid. Moreover, pursuant to the concession by respondent's expert, we are also persuaded (1) that the compensation received by the remaining resident managers (i.e., excepting Jones) was reasonable for the pertinent years in issue and (2) that the reasonable compensation received by these remaining resident managers was attributable to their having rendered services to the respective petitioner banks. ↩
11. SEC. 172. NET OPERATING LOSS DEDUCTION. (b) Net Operating Loss Carrybacks and Carryovers. (1) Years to Which Loss May be Carried. - (A) (i) * * * a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss. * * * (b) * * * a net operating loss for any taxable year ending after December 31, 1955 shall be a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss. ↩
12. SEC. 172(b) Net Operating Loss Carrybacks and Carryovers. (2) Amount of Carrybacks and Carryovers. - Except as provided in subsections (i) and (j), the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the "loss year") shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. * * * ↩
13. Petitioners have conceded in their reply brief that the petitioner Plentywood Bank is not entitled to a net operating loss carryforward for its taxable year 1967. However, they further contend that the respondent's failure to grant them an appellate conference was the primal cause for the Plentywood Bank not having timely carried back the 1966 net operating loss to its 1963 taxable year. We are not persuaded by this argument. Whether or not respondent granted petitioners an appellate conference did not in any way procedurally affect the petitioner Plentywood Bank's right to file a timely claim for refund for its 1963 taxable year to reflect the impact of the available carryback of its 1966 net operating loss. ↩
14. Sec. 503(a) (1) (B) was sec. 503(a) (1) (C) prior to the amendment of sec. 503↩ by Pub. L. 91-172, which was effective as of January 1, 1970. 15. Sec. 503(b) was sec. 503(c) prior to the amendment of sec. 503 by Pub. L. 91-72, which was effective as of January 1, 1970. Section 503(b) provides as follows: SEC. 503. REQUIREMENTS FOR EXEMPTION. (b) Prohibited Transactions. - For purposes of this section, the term "prohibitied transaction" means any transaction in which an organization subject to the provisions of this section - (1) lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest, to; (2) pays any compensation, in excess of a reasonable allowance for salaries or other compensation for personal services actually rendered, to; (3) makes any part of its services available on a preferential basis to; (4) makes any substantial purchase of securities or any other property, for more than adequate consideration in money or money's worth, from; (5) sells any substantial part of its securities or other property, for less than an adequate consideration in money or money's worth, to; or (b) engages in any other transaction which results in a substantial diversion of its income or corpus to; the creator of such organization (if a trust); a person who has made a substantial contribution to such organization; a member of the family (as defined in section 267(c) (4)) of an individual who is the creator of such trust or who has made a substantial contribution to such organization; or a corporation controlled by such creator or person through the ownership, directly or indirectly, of 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation. ↩
16. In remanding the case the Court of Appeals similarly stated the test as follows: We think the test must be that before disallowing deductions once approved there must be a finding that the variations from the plan somehow prejudiced the benefits to be received by the beneficiaries and somehow improved or increased the indirect benefits to the employer already inherent in the plan.Although the amount in dollars is large, yet if the shift in advantage to employer or employee is not very tangible it would appear that the variation is de minimis. Surely substance rather than strict form should be the guide. [Time Oil Co. v. Commissioner, 258 F.2d at 238.] ↩
17. With respect to Towe Farms, it is conceivable that, pursuant to double attribution, Towe's family's 99 percent interest in Towe Farms could be attributed to Towe and that this interest could then be further proportionally attributed to the respective petitioner banks in which Towe had an equity interest during the pertinent years in issue. However, after carefully considering sec. 503(b)↩, the accompanying regulations and the underlying legislative history, we can find no authority for such double attribution under the instant circumstances. 18. It should be recognized that a portion of the pertinent petitioner banks' claimed deductions for contributions to their respective profit-sharing trusts may have to be disallowed to reflect this Court's determinations that salaries paid to certain officers of some of the petitioner banks have been partially disallowed on the ground that the excess portion was deemed to be unreasonable. If such a determination is required, it should be reflected in the Rule 155 computation. ↩